a

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

| | |
|---|---|
| CHRISTOPHER WESTON #575678, Plaintiff | CIVIL DOCKET NO. 5:22-CV-00964 SEC P |
| VERSUS | CHIEF JUDGE S. MAURICE HICKS, JR. |
| JERRY GOODWIN, Defendants | MAGISTRATE JUDGE PEREZ-MONTES |

REPORT AND RECOMMENDATION

Before the Court is a Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254 filed by pro se Petitioner Christopher Weston ("Weston"). ECF No. 1. Weston is an inmate in the custody of the Louisiana Department of Corrections incarcerated at the David Wade Correctional Center in Homer, Louisiana. Weston challenges his conviction and sentence imposed in the First Judicial District Court, Shreveport, Louisiana.

Because Weston's Petition (ECF No. 1) is untimely, it should be DENIED and DISMISSED WITH PREJUDICE.

I. **Background**

According to the Louisiana Second Circuit Court of Appeal:

On the morning of May 8, 2016, Defendant [Weston] went to a home on Queens Street in Shreveport and shot Lakordo Jamerson whom he had accused of stealing his cigarette at the RaceWay gas station and convenience store ("the store") on Hearne Avenue. He was charged with attempted second degree murder and possession of a firearm by a convicted felon. The following testimony was adduced at trial.

1

The victim, Lakordo Jamerson, testified about the events on May 8, 2016, that led to his shooting. He stated that at approximately 10:00 a.m., he went to the store with his sister Alexis Hobbs and his brother Daniel Hobbs because he needed more cigarettes. The three traveled in Daniel's car. After leaving the store, they were going to Kimberly Weeks's house to see his four-year-old niece. He stated that when he arrived at the store, Weeks was already there buying pizza. Before he went into the store, he set his cigarette down on "the brick right there right by the door of the store" so he could recover it when he left the store. He recalled that he was in the store a very short time, just long enough to make his purchase; and, when he came out, he picked up his cigarette. He testified that as he did so, "he [Defendant] walked out behind me" in front of the store and confronted me and said, "y'all just f --- me and just take my cigarette." He told Defendant he had not taken his cigarette and even offered him one, and the two discussed what brands they smoked. He stated that after their discussion, Defendant "gave us a little look" and "just walked to his car," a Ford Explorer, and got on his phone. Jamerson talked with Weeks and ultimately went back to Daniel's car. He identified Defendant in court as the person who confronted him over the cigarette.

Jamerson further testified that after he got into Daniel's car (a black Impala), they went to Weeks's house and parked in the front of the house. He and Alexis went into the house first, eventually followed by Daniel. Shortly thereafter, Weeks "came rushing in saying there was somebody looking in our [Daniel's] car with a long gun." He "came out to look" and did not see anyone by Daniel's car, but then "looked down the street and that when I seen the Ford Explorer and I guess they seen me come out." He testified that the Explorer was the same one Defendant had gotten into at the store. The Explorer had turned into someone's driveway and was turning around, heading back in his direction, and then "he stopped at a stop sign," as he (Jamerson) was standing at the back of the Impala. He realized that the person with the gun was the same person he had seen about ten minutes earlier at the store. He stated that all he saw "was the back window rolled down" and Defendant drop the gun; then he ran. He testified that when Defendant began shooting, his four-year-old niece and a toddler were outside.

Jamerson stated that he crouched down in front of the Impala, and he estimated that between 15 and 17 rounds were fired. The first shot hit the trunk of the Impala when he and Daniel were taking cover on the side of the car. He left the protection of the car because his niece was still on the porch and ran "up the hill and tried to get near her in the house," but did not make it because he slipped. He did not know where

2

the shots were going. He tried to get his niece, but someone had already taken her in the house. He tried to run to the corner of the house and could still hear shots being fired, and it was then that he was shot. He stated that he was running with his phone in his hand and that the "gun must have been powerful," because "when it hit [him]," it threw his body "upwards and [his] phone flew all the way under another vehicle."

Jamerson further stated that he was first hit in his arm and the bullet traveled into his back; the bullet is still in him and cannot be removed because of the danger of paralysis. He stated that "you could see my bone," and there was blood everywhere. The shot in his arm slowed the bullet down and saved him, and he was happy to be alive because he has three children. He was in the hospital for two weeks and has numbness in his right leg because of the bullet that remains in his back. He also testified that he "can't work." The state introduced a box of "Kool short" cigarettes into evidence, which he identified as the type of cigarettes he smoked and bought in the store the day of the shooting.

Jamerson also testified that he had never seen Defendant prior to the shooting and described the encounter at the store as "nothing," just talk. He stated that the incident could have been avoided and that he had never been through anything like this before in his life. He identified Defendant as the man who shot him, but did not want to look at him.

On cross-examination, Jamerson confirmed that the encounter with Defendant at the store did not involve threats by either party. In addition to his previous testimony, he added that he was able to identify Defendant's vehicle as a white Ford Explorer because his family members had the same type of vehicle. He testified that the vehicle had a flat tire, or a donut tire. He could not recall if the vehicle had damage, a bumper sticker or a license plate, but reiterated that it was "the same truck you know, the same one and the same guy who was at RaceWay was in the back of that truck."

Jamerson described Defendant as having short dreads. He did not recall what he was wearing, but remembered he had a flip phone.

When asked about the Ford Explorer arriving at the house, Jamerson testified that he believed that there were two people in the vehicle because he saw Defendant roll the back window down. He also thought the driver was female because "there was a ponytail that sit straight at the top" of her hair; the driver's window was down enough for him to see the ponytail. The driver's hair was black. He did not know the race of

the driver and agreed that it could have been a male. He confirmed that the driver had not been with Defendant at the store.

Jamerson described the gun as having a "brown tip thing" that was long, like a rifle, that he called "a Draco, a Chopper." He confirmed that Defendant was the man with the gun. He recognized his face when he saw "his dreads and stuff and his face hanging out the window." He and Daniel confirmed to each other that this was "the same guy from the RaceWay."

Jamerson further testified that the shooter shot from the passenger side in the back seat because the house was on the passenger side. He stated that the car was stationary while the shots were fired, and none of the occupants said anything. He did not see the car drive off because he had been shot. He stated that his memory of the events was fine and he "remember[ed] it like yesterday," because this was the first time in his life something serious had happened to him. He denied using drugs or alcohol at the time and was on no medication.

Jamerson did not know why Defendant shot him or "why it was a problem." He never saw Defendant again; but, about three days after his two-week hospital stay, he was shown a photographic lineup at Weeks's house and he identified Defendant as the man who shot him. He recalled that the lineup contained about six or seven photos on one piece of paper. He had previously been shown a lineup when he was in the hospital, but he was in no condition to identify his assailant. He confirmed that neither detective suggested a certain photograph to him.

Daniel, Jamerson's older brother, substantially corroborated Jamerson's version of the events that occurred at the store, including his version of what Defendant said to Jamerson, accusing him of taking his cigarette. He identified Defendant as the person he saw come out of the store and stated that he had never seen him before and did not know his name.

Daniel confirmed that Jamerson asked the man what kind of cigarettes he smoked, and the man said "Newports." He recalled that his brother "pulled out a pack of Kools" and told the man, "we smoke Kool." He saw the man walk to his car, which was at a gas pump, and which appeared to have a flat tire. The man made a phone call. He stated that the man's car was white and it was "like, a Jeep" or SUV. He testified that he and his brother and sister left the store while the man was pumping gas.

Daniel also corroborated Jamerson's description of their journey to Weeks's house. He confirmed that Weeks came into the house and she

4

asked him and Jamerson if they knew "this guy right here," because he had been following her. He and Jamerson walked outside to see who it was and saw "the same car from RaceWay, the same flat tire, the same everything." He corroborated Jamerson's description of the actions of the white Explorer, but added that once the car parked on the side of the road, he saw "him [Defendant] jump into the back of the car, up in the back of the seat" with a "Draco" or "AK-47." He estimated that he was about three feet from him, standing right at his car. The man pulled out the gun, dropped it and then picked it up and started shooting. He identified Defendant as the shooter.

Daniel stated that he then got into his car and tried to leave, but a bullet hit his car. He confirmed that Jamerson ran up the hill toward the house and fell. As he started to drive away, he saw Jamerson on the ground, shot, so he picked up Jamerson and noticed that the white car was no longer there. He confirmed that "[a] whole bunch of kids" were outside on the porch when the shots began, although he did not know how many shots were fired.

Daniel identified a copy of a six-person photographic lineup shown to him and from which he identified Defendant as the shooter. He confirmed that the dispute at the store was only a verbal conversation, started by Defendant, over a cigarette.

On cross-examination, Daniel testified that the vehicle driven by Defendant was white, "Jeep like," but stated that he was not good with cars. He recalled that the vehicle was a four-door and that there was nothing unusual about it, except that it had a flat or low tire. He stated that when he saw the vehicle at Weeks's house, the tire was still low. He testified that there was only one person in the vehicle at the store, but there were two at Weeks's house, so Defendant must have called somebody.

Daniel described the second person in the white vehicle as being "chubby, low cut," having "all even hair," and was a medium-toned black male. He stated that no words were exchanged and that Defendant "just fired shots for nothing." He recalled that the barrel of the gun was black; he did not recall if the vehicle had any window tinting.

Weeks corroborated the testimony of Jamerson and Daniel regarding the encounter with Defendant at the store. She estimated that she left the store approximately three to four minutes after Jamerson, Daniel and Alexis, who were all waiting for her when she got home. After she got out of her car, she saw "the vehicle that the person that walked

5

outside of RaceWay got into" pull up in front of her house. She went into the house and told Jamerson and Daniel that the "car we just got into it with at the RaceWay is in front of the house" and that she did not know what was happening. She stated that as soon as Jamerson, Daniel and Alexis went outside, "the car took off and they went all the way down to the end of the street, did a U-turn and c[a]me back." She recalled Alexis saying that the people in the car had a gun, so she took her children and put them in the house.

Weeks testified that before she could get into her house, the "gun started going off." She found a casing the next day where a bullet had gone through a room at the back of her house, but she threw it away. She confirmed that she viewed a photographic lineup, but was unable to identify anyone as the perpetrator.

On cross-examination, Weeks testified that her roommate found a shell casing in the house in "the corner of the back bedroom" when she was cleaning that room the day after the shooting. She stated that she did not see the person shooting from the vehicle, but that she heard about "a good 15" shots. She confirmed that nobody shot from her house and that there were people on the porch when the shooting started.

Weeks also testified that when she left the store, she did not notice the white vehicle follow her, but assumed the driver did because she did not know the man and he would not have known where she lived. She would not say that she assumed it was the same person; she stated that she saw the same vehicle as the one at the store.

Detective Marlon Clark of the Shreveport Police Department testified that he investigated the crime on May 8, 2016. He received a call shortly after 10:00 a.m. notifying him of a shooting that occurred at 2210 Queen Street in Caddo Parish. He was told that an individual was taken to University Health with serious, but not life-threatening injuries. He spoke with the witnesses and learned about the encounter at the store, where he went with "the CSI" to view the video surveillance footage. The video showed Daniel, Jamerson and Weeks talking in front of the store. He testified that "you could see the white Ford Explorer pull up, park at the gas pump," and a "black male, heavyset, with some short dreads walk into the store, purchase something at the counter and walk out." The video also showed "a verbal exchange between him and the other people outside and then he walks back to the car."

Det. Clark confirmed that the video showed no physical altercation and that "approximately seven minutes later the victim and the people that

6

were with him ended up leaving," traveling "kind of north which would be towards Queen Street off of Claiborne." He stated that the white Explorer stayed there, but, after several minutes, it left. The video shows several minutes later "what appears to be the same white Ford Explorer cut through the parking lot of RaceWay and then go back down Claiborne towards the direction of Queen Street."

Det. Clark further testified that the store video was collected on a thumb drive by a CSI detective who gave him a copy containing the wrong footage. He identified an exhibit which was the empty folder that contained the erroneous DVD copy. He had marked the folder with the case number and written, "Target: White Ford Explorer pulls up, male driver with dreadlocks enters the store and looks at camera," and placed it in his case file.

Det. Clark also testified that he went to the hospital and spoke to Jamerson, who was in extreme pain from his injuries and unable to give him basic information about the shooting. He stated that no one he spoke to knew the name of the man at the store, but Jamerson told him that it was the same person who had shot him. He interviewed Daniel on the day of the incident, who indicated that he had not seen the man at the store before.

Det. Clark further testified that several weeks later he received information that Defendant was the shooting suspect. He located a photograph of him, which matched the video footage from the store. He created a six-person photographic lineup, which he showed to Jamerson at Weeks's house. He identified the lineup, stating that Jamerson viewed it and "immediately identified image number four as the suspect which was Christopher Weston." He stated that Daniel also identified Defendant from the lineup as the person who fired from the vehicle. He testified that although they were at the same address, Jamerson and Daniel separately viewed the lineup at different times.

Det. Clark drafted an arrest warrant for Defendant on charges of attempted second degree murder and possession of a firearm by a convicted felon and pulled a criminal history report on him. He determined that Defendant had previously been convicted of a felony in Caddo Parish. He was shown the record of case docket number 282,184 and verified that the bill of information contained the name Christopher Weston. He read into the record the minute entry of September 23, 2010, as follows:

7

The accused present with counsel, Alex Rubenstein, withdrew his former plea of not guilty and pled guilty to count number one and count number two, attempted illegal carrying of weapons while in possession of CDS. The Court informed the defendant of his constitutional rights as per *Boykin v. Alabama* (see court reporter's transcript.) Whereupon, the defendant was sentenced, as to count number one, to pay a fine of $2,000 and court costs, or in default thereof, to serve 60 days in the parish jail to be paid through inmate banking and, in addition, to be confined to hard labor for a period of five years and committed to the Louisiana Department of Corrections subject to the conditions provided by law. The defendant was sentenced to count number two to be confined at hard labor for a period of two years and committed to the Louisiana Department of Corrections subject to the conditions provided by law. The Court ordered said sentence to run concurrently with any other sentence with credit for time served and informed the defendant of the right to post-conviction relief proceedings. The Court ordered the money and weapons forfeited.

Det. Clark testified that he contacted the U.S. Marshal's task force in an attempt to locate Defendant. As he researched Defendant, he received information regarding a Jacorey Smith, who did not appear in the store video. He stated that the U.S Marshals investigated a Lincoln Town Car that stopped at a house on DeSoto Street. The agents sat outside and waited as the three occupants of the vehicle went into the house. He was uncertain as to why the U.S. Marshals focused on this vehicle, but he suspected that they had "gotten information that that house was possibly associated with Christopher Weston." After the occupants of the home left in the vehicle, U.S. Marshals conducted a traffic stop. He was present at that stop and confirmed that there were three black males in the Lincoln Town Car, one of whom was Defendant. He testified that Defendant was taken into custody, and he identified him in court.

Det. Clark further testified that after Defendant's arrest, a search warrant was obtained for the DeSoto Street residence belonging to Jacorey Smith. He was present when the house was searched and stated that two firearms were recovered, one of which he identified as the rifle that had been recovered from a closet in a downstairs bedroom of the DeSoto residence. The rifle was offered into evidence as Exhibit S-9.2 He stated that it was a 7.62 caliber rifle that he "always kind of called it AK-47," although he knew this was not technically correct, and that the gun also was known as a "Draco" or "Chopper." He testified that it was determined that Jacorey Smith lived at the house on DeSoto Street and that the gun found there was not fingerprinted because, in his

8

experience, the surface of the gun would never produce a print that could be matched. He stated that no DNA analysis was performed on the gun. On cross-examination, Det. Clark testified that no shell casings or projectiles were found at the scene and that there were "none found in the house or at the vehicle where it was struck." He noted that there were fragments in the victim himself, but they were not removed. He also confirmed that neither Defendant's fingerprints nor DNA were found on the rifle because it was not processed and that it could not be connected to the shooting since no shell casings or bullets were recovered from the scene. He confirmed that it was possible that it was not the firearm used to shoot Jamerson. He stated that he was not aware that a shell casing was found in Weeks's house the next day and that her house was never searched.

Det. Clark stated that the store's color video showed a black male with "a twist" and the white Explorer parked in the gas line, 30 to 40 feet from the front door where the camera was located. He did not observe a flat tire on the vehicle. He did not realize until he prepared for trial that the video was gone. He checked to see if "it was in our system as a backup, and it was not." The video did not show the license plate of the vehicle and he was never able to locate the white Explorer or its possible owner. He confirmed that there were no indications that Defendant lived at the DeSoto Street house where the rifle was found and that he could not determine whether Defendant owned a white vehicle.

On redirect, Det. Clark testified that he believed the shell casings were in the vehicle if the gun was fired from inside, explaining that "if the window is down and the barrel is sticking out, the round of the shell casing should eject back or right." He stated that the shell comes from the side, so if the barrel were outside the window, it would eject into the car.

Officer Roderick Lewis testified that he was on patrol when he received a radio communication from U.S. Marshals requesting an available unit. He responded and was "take down unit," activating his lights and sirens to make a traffic stop of the vehicle which had illegal switched tags. After stopping the vehicle, he made contact with the driver and two passengers and called the stop into dispatch. A video of the stop was recorded, and a portion of that video was played for the jury. He further testified that one of the individuals in the stopped vehicle identified himself as Christopher Weston. The officers informed him they had a warrant for his arrest for attempted murder.

9

On cross-examination, Ofc. Lewis conceded that he was not involved in the investigation of events that occurred on May 8, 2016, and confirmed that he stopped the "Lincoln Town Car" because it was already under surveillance by the U.S. Marshals, and he had been instructed to follow it.

Carla White, tendered as an expert in firearms examination, identified a box of evidence, which included a 7.62x39 millimeter rifle, marked as Exhibit S-9. She tagged the rifle and test fired it and packaged the test fires in a brown envelope identified and marked as Exhibit S-10. She identified the "NW number" as the case number which would be put on any item received by her.

On cross-examination, White testified that the gun "brand is a Century Arms," and the model number was "GP1975 Sporter." She confirmed that an AK-47 "is a specific model of a 7.62x39 millimeter gun," explaining that "a lot of times people refer to a gun of this caliber as an AK-47," but that \*\*14 this gun "is not specifically an AK-47." She agreed that the gun was not an AK-47, but was the same 7.62 caliber.

White also confirmed that she never received any projectiles to test from police and did not fingerprint the weapon or detect any signs that any attempt had been made to fingerprint it. She stated that the "type of surface on this gun" would make it difficult to determine. She testified that she could not tell if the firearm had been fired. She also testified that the firearm had remained at the crime lab until the day of her testimony and that no DNA analysis was conducted on the gun.

Officer Danny Duddy of the Shreveport Police Department testified that he was the current supervisor of the crime scene investigation unit and was a certified latent fingerprint examiner. He was qualified as an expert in fingerprint identification. He identified an exhibit which contained Defendant's fingerprints from case docket number 282,184.3 He was allowed to take Defendant's fingerprints in court, which were also introduced into evidence. He compared the fingerprints from docket number 282,184 and those he had just taken and testified that they were made by the same individual.

The defense rested and did not call any witnesses.

*State v. Weston*, 52,312 (La.App. 2 Cir. 11/14/18, 1–14); 260 So.3d 722, 726–32, *writ denied*, 2018-2066 (La. 4/22/19); 268 So.3d 299.

10

Weston was convicted of one count of possession of a firearm by a convicted felon, and one count of attempted second-degree murder. The jury also found that Weston's use or discharge of a firearm in the commission of the attempted second-degree murder had been established by clear and convincing evidence under La. C. Cr. P. art. 893.3. Weston received consecutive sentences of 30 years for attempted second-degree murder, and 15 years for possession of a firearm by a convicted felon. *State v. Weston*, 52,312, p. 1 (La.App. 2 Cir. 11/14/18); 260 So.3d 722. The conviction and sentence were affirmed on appeal. *Id.* The Louisiana Supreme Court denied writs. *State v. Weston*, 2018-2066 (La. 4/22/19); 268 So.3d 299.

Weston filed an application for post-conviction relief on December 14, 2020, claiming he is factually innocent and that he received ineffective assistance of counsel. ECF No. 1-3 at 25. The application was denied on July 22, 2021. *Id.* at 27. The appellate court denied Weston's writ application on the showing made. ECF No. 1-3 at 40. The Louisiana Supreme Court denied writs because Weston failed to show that he received ineffective assistance of counsel under the standard of *Strickland v. Washington*, 466 U.S. 668, 674 (1984), and failed to satisfy his post-conviction burden of proof as to his innocence claim. *State v. Weston*, 2021-01674, p. 1 (La. 2/8/22); 332 So.3d 632, 633.

Weston claims that he received ineffective assistance of counsel because his attorney failed to raise on appeal the trial court's admission of a firearm into evidence. ECF No. 1. He also claims that he is factually innocent. *Id.*

## II. Law and Analysis

### A. Weston's Petition (ECF No. 1) is controlled by Rule 4 of the Rules Governing § 2254 Cases.

Rule 4 of the Rules Governing § 2254 Cases provides that, following an examination of the pleadings by a court, "'[i]f it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court, the judge shall make an order for its summary dismissal and cause the petitioner to be notified.'" *See Kiser v. Johnson*, 163 F.3d 326, 328 (5th Cir. 1999) (quoting the Rules Governing § 2254 Cases). This is such a pleading.

### B. Weston's Petition is untimely.

In 1996, as part of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Congress enacted 28 U.S.C. § 2244(d), which provides a one-year statute of limitations for filing applications for writs of habeas corpus by persons in custody pursuant to the judgment of a state court. The limitations period generally runs from "the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review. . . ." 28 U.S.C. § 2244(d)(1)(A). Federal courts may raise the one-year limitations period *sua sponte*. *See Kiser v. Johnson*, 163 F.3d 326 (5th Cir. 1999).

The statutory tolling provision of § 2244(d)(2) provides that the time during which a properly filed application for post-conviction relief is pending in state court is not counted toward the limitations period. *Ott v. Johnson*, 192 F.3d 510, 512 (5th Cir. 1999). However, any lapse of time before the proper filing of an application for post-conviction relief in state court is counted against the one-year limitations period.

*Villegas v. Johnson*, 184 F.3d 467, 472 (5th Cir. 1999) (citing *Flanagan v. Johnson*, 154 F.3d 196, 199 (5th Cir. 1998)).

Weston's conviction became final on July 22, 2019, 90 days after the Louisiana Supreme Court denied writs, when his time for seeking review in the United States Supreme Court expired. *See id.*; *see also* U.S. Sup. Ct. R. 13.

Weston filed an application for post-conviction relief on December 14, 2020, almost five months after the one-year limitations period under the AEDPA had expired. Therefore, Weston is not entitled to statutory tolling, and his Petition is untimely.

C. **Weston does not qualify for an exception to the statute of limitations.**

Weston argues that he is entitled to proceed with his § 2254 Petition under *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). *McQuiggin* allows a habeas petitioner with an untimely petition to overcome the time bar by making a convincing showing that the petitioner committed no crime. *Id.* The petitioner must show that "no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt." *Id.* at 386-87 (citing *Schlup v. Delo,* 513 U.S. 298, 329 (1995)).

The petitioner must show factual innocence through the presentation of "new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence." *Schlup*, 513 U.S. at 324; *Stroman v. Thaler*, 405 F. App'x 933, 934-35 (5th Cir. 2010). The United States Fifth Circuit Court of Appeals has held that evidence is "not 'new' [when] it was always within the

13

reach of [petitioner's] personal knowledge or reasonable investigation." *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008).

Weston's purported new evidence is an affidavit of Candace Robinson dated November 5, 2020. Ms. Robinson indicates that Weston is the father of her children and that she was with Weston at his mother's home on May 8, 2016, from 9:30 p.m. until 11:00 a.m. the next morning. ECF No. 1-3 at 1. Ms. Robinson concludes Weston could not have committed the crime because he was with her. *Id.*

This evidence is not "new" because the information contained in the affidavit was certainly known to Weston at the time of trial. If Weston was with Ms. Robinson at his mother's house when the crimes were committed, he certainly knew that before trial and before the time for filing a habeas petition expired. *See Tyler v. Davis*, 768 F. App'x 264, 265 (5th Cir. 2019) (citing *Schlup*, 513 U.S. at 324; *Moore*, 534 F.3d at 465; *Hancock v. Davis*, 906 F.3d 387, 389 (5th Cir. 2018)).

Regardless, the affidavit does not establish Weston's innocence because the crimes were committed on the morning of May 8, 2016. *Weston*, 260 So.3d at 726 ("On the morning of May 8, 2016, Defendant went to a home on Queens Street in Shreveport and shot Lakordo Jamerson…."). Ms. Robinson's affidavit states that she was with Weston on the evening of May 8, 2016, from 9:30 p.m. until the next morning. ECF No. 1-3 at 1. Thus, according to the affidavit, Ms. Robinson was with Weston after the crimes were committed.

Additionally, the victim testified that he saw Weston fire approximately 15 to 17 rounds at him. *Weston*, 260 So.3d at 727. Detective Clark testified that video

14

surveillance showed a man matching Weston's description have a verbal encounter with the victim and get in a vehicle that matched the description of the vehicle from which the shots were fired. Therefore, even with the affidavit and testimony of his children's mother, Weston could not establish no reasonable juror would have voted to find him guilty beyond a reasonable doubt.

Weston cannot meet the requirements of *McQuiggin* to overcome the time-bar.

### D. Weston is not entitled to equitable tolling.

Although the AEDPA's one-year statutory deadline can be equitably tolled in exceptional circumstances, none exist in this case. *See Holland v. Florida*, 560 U.S. 631 (2010); *Davis v. Johnson*, 158 F.3d 806, 810-11 (5th Cir. 1998).

A petitioner bears the burden of proof to invoke equitable tolling. *See Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002). To be entitled to equitable tolling, a petitioner must show diligent pursuit of rights, and that some extraordinary circumstance prevented timely filing. *See Mathis v. Thaler*, 616 F.3d 461, 474 (5th Cir. 2010). Highlighting the doctrine's limited scope, the Fifth Circuit has stated that "[e]quitable tolling applies principally where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting his rights." *Clarke v. Rader*, 721 F.3d 339, 344 (5th Cir. 2013) (citing *Coleman v. Johnson*, 184 F.3d 398, 402 (5th Cir. 1999) (internal quotation marks omitted)).

Weston does not allege that any extraordinary circumstance prevented timely filing, and the Court finds none in the record.

15

## III. Conclusion

Because Weston's Petition (ECF No. 1) is untimely and he is not entitled to equitable tolling or other relief, IT IS RECOMMENDED that his Petition (ECF No. 1) be DENIED and DISMISSED WITH PREJUDICE.

Under 28 U.S.C. § 636(b)(1)(c) and Fed. R. Civ. P. 72(b), a party may file written objections to this Report and Recommendation within 14 days of service, unless the Court grants an extension of time to file objections under Fed. R. Civ. P. 6(b). A party may also respond to another party's objections to this Report and Recommendation within 14 days of service of those objections, again unless the Court grants an extension of time to file a response to objections.

No other briefs may be filed without leave of court, which will only be granted for good cause. A party's failure to timely file written objections to this Report and Recommendation will bar a party from later challenging factual or legal conclusions adopted by the District Judge, except if the challenge asserts "plain error."

SIGNED on Friday, August 12, 2022.

_____
JOSEPH H.L. PEREZ-MONTES
UNITED STATES MAGISTRATE JUDGE